I-Ibmphill, Ch. J.
This cause was argued very elaborately some three terms since. The most important questions which stimulated the zeal, elicited the efforts, and impelled and extended the researches of counsel, have been decided in other causes; but enough remains to inspire us with a just appreciation of the difficulties surrounding questionsof the character presented in this ease, and which are eloquently delineated by the counsel of (he appellant in the eighty-sixth page of his brief. After enumerating- various considerations which might perplex an officer or citizen, lie expresses himself in the following terms: “These are questions which have seriously embarrassed the highest court iu the State for the last twelve months, and which 1 hold it is impossible for the court to solve, without the greatest injustice to the citizens of Texas,. *189 with its present limited information as the laws and customs of Spain and Mexico, in relation to land matters.”.
The obscurity here shadowed forth over the face of the legal heavens lias not been dispelled. We have waited long, hut in vain, for the light of more information. The effort of the Government, by hooks or documents or otherwise, to enlarge the sources of legal knowledge, lias been extremely limited; ■and of the parties interested in such questions it may he said that, comparative! jT, at least, they have done little or nothing at all. But the accumulation ■ of business imperiously requires that all causes in which the court can attain a reasonable degree (under the circumstances) of certainty in their conclusions should be decided. And with these preliminary observations on a subject-suggestive of the most unpleasant reflections, I proceed to consider the questions in the cause, and which all grow out of objections to the title of the defendant.
First. Its admission in evidence is objected to, on the ground that the testi-monio offered was not a certified copy of any original document legally recorded in the State, nor the certified copy of any record from a proper officer duly made in this State, and that the original concession and other documents in ■said testimonio were forged and antedated, the charge of forgery and antedating being supported by'affidavit.
There'is no validity'in the objection to the legality of the record of the document. The officer who had executed the protocol, and who had issued to the party interested the copy or second original, appeared before the county register and acknowledged his signature to the certificate authenticating the testi-monio, and this was sufficient, under the 35th section of the act of ÍS30, (art. 2752, Dig.,) to have authorized its record. This point was considered in the case of Paschal v. Perez.
The difficulty under which most of our titles, anterior to the Revolution, labor is, that they emanated, either in whole or in part, either primarily or in their entire structure, from a Government now foreign; and that the original protocol, register, matrix, or memorandum, by which the verity of ail copies, whether it be the testimonio or the second copy, might, on proper showing, be required to be tested, now remains in the archives of a foreign country. Where a whole class of titles depends upon a single commission or decree, there would be little danger of fraud in admitting the copy of the decree or •commission to be conclusive evidence. The claims of the officer to the power, upon the validity of which depend the interests of many, would be likely to be severely scrutinized, and their genuineness ascertained. But where the grant is special, limited to the execution of a single one, a fabricated copy of a concession, if made by a corrupt officer the foundation of title, might pass unno- • ticed and be now difficult of detection. The archives are beyond the jurisdiction ■of the State, and to a great degree inaccessible. But while the difficulty is acknowledged, the party interested, holding such evidence of title, cannot be •expected to perform impossibilities. If the original remaining archive were within our territorial limits, he could not produce it. It would be the property ■ of a public officer, not subject to his disposition, and he would at best ,be hut entitled to a certified copy. But, as has been stated in other cases, the fact that it was addressed to an officer familiar with the then modes of proceeding, • and the attestations which imparted faith to documents emanating from the Executive Department, and became, on his judgment of its genuineness, the basis of his action, affords a strong presumption of the existence of the original; and this, not being rebutted by circumstances engendering suspicion, must be fully sufficient to sustain the right. The officer who acted upon this decree or concession was a witness at the trial, and proved his execution of the title; all of which action was, of course, predicated on his preliminary decision in favor of the authenticity of the grant. One of the officers of the ayunta-miento, upon whose certificate the decree or concession purports to be founded, had a recollection of making such certificate, and the testimonio was recorded •soon after the change of government. The circumstances are eorrob- *190 orative of the fact of the existence of the original, and there was no error in> the ad-mission of the title by the court.
The next objection is, that the title is imperfect and will not sustain an action. This point has been elaborately discussed in the case of Hancock v. McKinney, and as the space allotted to the preparation of this opinion is brief, I will not enter into a prolonged examination of the subject. We are of opinion that beyond Ute extension of title by the commissioners, no further act was necessary to consummate the, fee in the grantee. That this fee was subject to-defeasance if certain conditions were not performed, did not reduce it to that class of incipient equities which required recognition before they could be perfected into a patent or become the foundation of an action. 'The law nowhere indicates that posterior to the performance of these conditions a more perfect title or assurance will he issued by the Government, or that any confirmation or further title is necessary. Had any ulterior action by the political authority been deemed essential to pass the fee, all the titles of the colonists would doubtless have been subjected to t he Boards of Land Commissioners. But such was not the action of the sovereign power. AH titles of possession issued to colonists were deemed final or sufficient to pass the fee; but there were certain onerous conditions from which they were relieved. But ail to whom titles of possession were not extended, who held by surveys, amparos, or other incipient and inchoate claims, no matter how long- their possession liad continued, were constrained to comply with t he requisition of the law of 1837 before their claim could be perfected into a patent or have standing in a court of justice. Without further argument on this point, and referring to the case of Hancock v. McKinney and Paschal v. Perez, for the distinction between a perfect and' imperfect title, I will proceed to examine the third objection, which is as to the capacity of the grantee to receive under the laws of colonization. She was a married woman; and if by law site was incapable of receiving a grant, the title must necessarily be void; but before she can be divested of title, she must come clearly within some positive or implied inhibition of the law regulating the subject-matter. It is true, that in some of the provisions of the'colonization law the beneficiary is described as being of the male sex. In the. 3d and 4th sections of the law of colonization of the 24th of March, 1825, the word estrangero is used, which means a foreigner of the masculine gender; but if the head of a family were a female, this would not exclude her from the benefit of the law, because the intention of the policy of the decree was to confer such a quantum of laud on a family, whether they were represented by a male or female. (Partidas, 7, tit. 33, 1. 6; 2 Sala., 352.) Generally, throughout the colonization law, the word family is used in contradistinction to a single or unmarried man. In the 14th article it is said that one labor shall he granted to each family occupied in cultivating the soil; and in the 10th, families and single men arc again put in contradistinction; in the 37th, the executive is authorized to increase the portions allotted by the foregoing articles in proportion to the family, activity, and industry of the colonists ; and by article IStli, the families who shall arrive shall present themselves to the political authority, &c., who shall put them in the possession of their lands, and shall report the same, to the end chafe a title may he dispatched to-them. It will appear from these provisions that the head of the family does not appear so prominently as the person designated to receive the grant-, as he is made to appear under the Constitution and the subsequent laws. The family is to he provided for. It is for them that the bounty is intended ; and if the grant he made to accomplish this design, it fulfills all the purposes intended or contemplated by law. The controlling consideration in this case is, that in substance, it matters not whether the grant be made to the wife or the husband. It was not altogether a gratuity. It was burtheued with some onerous duties, and was not acquired by a lucrative title. It formed, therefore, a portion of the community property, and was as much under the control and tlie disposition of the husband as any other portion of the acquests and; gains. He could sell it or dispose of it in any mode not intended to defraud *191 the wife. This was fully determined in the case of Yates v. Houston. (3 Tex. R., 433.)
If the concession were a gratuity, then it would become the separate property of the beneficiary, and there might become grounds of objection to the title;, hut as it is, the objection cannot be sustained, and the subsequent act of the husband in applying for and obtaining a certificate for a headlight as a bead of a family, cannot, under the circumstances, invalidate the former grant. He did not pretend to renounce, all benefit under this grant. Whether this could have been done or not is questioned. Any act of this character could not be made to operate to the injury of his wife or a third person. How far it might have affected his own is yet to be decided. But in this case there was no-attempt, in procuring the second grant for the benefit of the family, to relinquish any right to the former. Whatever effect such a state of facts may have upon the second grant, it cannot affect the validity of the first, and this, especially, after it has been transferred to third persons.
The point in this case, as to the capacity of a married woman to be treated: by the Government officers as the head of the family, and whether she be so considered or not, her ability to receive grants under the colonization law was, in effect, decided in the case of Langford v. The Republic. (Dallam, 588.) ;
The husband is, by law and courtesy, esteemed the head of the family, and. this is said by Spanish jurists to be owing to his greater force, prudence, and aptitude. (Dictionary, verbo Majeudo.) But every rule has its exceptions, and none has more frequent and notable ones than the present. We know that, in point of fact, the reason of the rule frequently fails, and that the wife is superior in all the attributes which give force to character or qualify their possessor for the management and control of the affairs of a family. This concession
is not, however, placed on that basis. She is not made the recipient of the title on any ground of real or fancied superiority over her husband. She is, however, stated to be the owner of cattle, and she desires lands on which they may be grazed. But the fact that she is a married woman is distinctly presented to the Executive, who had most extensive powers of control, limited, however, by laws over the public lands. In his judgment, she had capacity to take and hold lands by grant from the Government. Now, the presumption is always in favor of the correctness of the construction placed on a statute by officers employed in its administration, and especially, where this construction is contemporaneous, or nvarly so, with the statute itself. (People v. Maurau, 5 Den., 396.)
The concession under the decree T2S is founded upon the consideration of the calamities and privations suffered by the inhabitants of the frontier towns from the hostilities of the Indians. It declares that the citizens settled in any town frontier to the savage tribes, and wtio shall have a fixed residence of twenty-four, thirty-five, or forty years, and who have sustained the said towns with their arms and toils, shall be favored with a concession of the part of the dues belonging to the State. Now, although the most apparent construction would be that the grants under tiffs law were intended for the reward of the male inhabitants, yet, in fact, it differs from no other headlight grant for the benefit of the family, except that a portion of the dues are remitted, and the-title, therefore, if made to the husband, becomes a portion of the ganancial property, and if made to the wife, it takes precisely the same direction, and becomes, exactly to the same extent as if it had been made to the husband, a portion of the community.
Again, can it be supposed that the Government intended to reward only the male inhabitants of the frontier towns'? Do not the women sustain the frontier with their toils, if not with their arms? Are they not subjected to the same and to infinitely worse horrors from the hostilities of the savage foe? Do they not prepare the warrior for battle, rouse all the fires of his soul, and *192 ■.stimulate him to the most daring achievements? Do they not nerve his heart' with the courage which prefers death to disgraceful flight and' inspire him with the resolution to return victorious or return no more? Do not their smiles of approbation operate as the most powerful incentive and as the most .grateful reward of the soldier? And while the warriors are absent on distant ■expeditions, are not their families sustained by the toils and struggles of their wives, mothers, and sisters? Do not their hands bedeck the brow of the hero with laurels in the hour of conquest, and their sympathies revive his drooping spirits in defeat? Do they not bind up his wounds, soothe his anguish, and comfort him even in the hour of death?
Note 09. — Hancock t>. McKinney, post, 38á; Cavazos v. Trevino, 35 T., 133; City of Brownsville "»> Rasse & Hord, 36 T., 461.
And if the Governor of the State should honor and reward one of the patriotic daughters of the soil by a grant of land, under a power susceptible of such construction, and which, at all events, operates in precisely the same way and to the benefit of the same persons that would have been benefited had it been conceded to the husband, it would be too much to say that the act was void for the want of power in the grantor or capacity in the grantee, and we are therefore of opinion that this grant is not void, at least on this ground.
The only remaining objection is. that the title was extended by the first regidor, whereas the commission was directed to an alcalde, and that the grant is therefore void for the want of authority in the granting officer. It is sufficient to say, in answer to this objection, that the commission is directed to an alcalde, and it may therefore be executed by one who is charged by law with tile powers and duties of that office. In case of decease, legal impediment, or vacancy of the office of alcalde, his place was filled by the first regidor. (Vide art. 11, decree 262; art. 6, decree 124.)
We are of opinion that there is no error in the judgment, and that the same be affirmed.
Judgment affirmed.